**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Leo CRUMLEY, Defendant-Appellant.**

No. 77-5192.

United States Court of Appeals,
Fifth Circuit.

Jan. 9, 1978.

Arthur Parker, Birmingham, Ala., for defendant-appellant.

J. R. Brooks, U. S. Atty., Geo. C. Batcheler, Asst. U. S. Atty., Birmingham, Ala., for plaintiff-appellee.

Before MORGAN, HILL and FAY, Circuit Judges.

FAY, Circuit Judge:

The defendant, Leo Crumley, was indicted for knowingly receiving, concealing, storing, bartering, selling and disposing of a stolen motor vehicle which had been part of interstate commerce. 18 U.S.C. § 2313. A jury found him guilty and he was sentenced to four years imprisonment. Crumley appeals and assigns two errors. First, that the trial court erred when it limited cross-examination of a government witness on his motive for testifying. He also contends the trial court erred when it refused to allow him to determine, through cross examination of a government witness, the location of the "track sheet" which identified the cab as part of the stolen motor vehicle. We agree that the trial court erred as to the first issue and reverse and remand for a new trial. The second issue we find to be without merit.

On December 9, 1975, a 1971 Ford F–350 Sports Custom truck with a 480 Holmes wrecker attached was stolen from the Cartersville Tire Service in Cartersville, Georgia. The establishment's owner, Jimmy Ray Hardin, purchased the truck in November, 1972, and personally repaired, customized, and replaced its parts. The vehicle's identification number (VIN) was F35HCK 85721. The two parts of the wrecker unit, the wrecker and the body also had serial numbers. These serial numbers were engraved on metal plates riveted to the corresponding part at the time Holmes, the manufacturer, assembled and attached the wrecker unit to each truck. The wrecker involved here had the serial number B71CO–1084 and the body had the serial number B71B20542. Each of the letters, numbers or sequence of numbers signified to Holmes specific information about that wrecker unit.

In July, 1976, a 1972 Ford truck, with a Holmes wrecker unit attached, was discovered by police on the property of Leo Crum-

ley in Anniston, Alabama. Special Agent Larry Sylvester of the F.B.I. and several other state and local law enforcement officers went to Crumley's home to inspect the wrecker on July 16, 1976. Sylvester knocked on the door and when Crumley answered told him he had reason to believe the wrecker parked at the back of his property was stolen and wished to inspect it. Crumley immediately agreed and Sylvester, followed by the other officers in their vehicles, went to where the wrecker was parked.

Sylvester found, upon inspection, the vehicle was a 1972 red Ford F–350 custom truck, VIN F37YCM87076, with a Holmes model 480 wrecker unit attached. The original numbers on the identification plates found on the wrecker and the body were, in the opinion of several law enforcement officers, ground off and the plates restamped with new serial numbers. The wrecker's new number was B74CO45514 and the body's was 147B45514. The vehicle was confiscated from Crumley and immediately impounded at nearby Woods Body Shop. The metal identification plates were removed from the wrecker unit that same evening and given an acid test which, when successful, will make the original obliterated number reappear for several minutes. This test was successful and the partial sequences of numbers then visible matched portions of the original serial numbers mentioned above. A representative of the Holmes wrecker manufacturer also testified that even though the metal plates removed by Sylvester were original Holmes plates, the serial numbers restamped did not match the type and year of the wrecker unit recovered.[1]

Testimony elicited from law enforcement officers present at Leo Crumley's when the vehicle was inspected and confiscated indicates Crumley cooperated with them. One officer said Crumley stated the vehicle was "legal" and he had papers on it. Crumley also said it was not a Holmes wrecker even though Holmes name was on it in at least three different places. He also stated the wrecker was at the back of his property because he wanted to move a tree which had fallen across the fence when struck by lightning. He stated he had purchased the truck and built the wrecker.[2] Although Crumley objected to their taking the wrecker and took all of the officer's names, he aided them in starting the truck which was "cold-natured". The battery also ran down from attempting to start the truck and Crumley helped jump it.

Immediately after the wrecker was impounded at Woods Body Shop (and prior to its subsequent disappearance) Jimmy Ray Hardin came to Alabama to identify his property. Before seeing the wrecker he was asked by Agent Sylvester to list and describe as many points possible on his wrecker which would enable him to identify it. Without our listing them, Hardin found the points listed beforehand and others on the wrecker. For example, beyond just parts and accessories, broken parts that were repaired by Hardin himself in a manner described by him were found on the wrecker. Although the cab was not his, Hardin did identify the truck's engine as the one he had rebuilt for his wrecker.

The 1972 Ford truck, to which the stolen wrecker unit was found attached, was purchased from Melvin Gann and Odell Spurlin, partners in a service station, body shop and wrecker business. Gann, a good friend of Crumley, testified Crumley and G. J. Haynes came to his shop and negotiated with him for the purchase of the truck. Gann and Spurlin used the truck as a wrecker in their business but when they sold it removed the wrecker unit from the truck's chassis. When Crumley returned to pick up the truck the next day, Gann was

---

1. The vehicle with a wrecker unit, confiscated from Crumley and impounded at Woods Body Shop, was stolen within a week of its impoundment. Pictures of it taken the day after it was confiscated were admitted into evidence at trial for identification of the vehicle.

2. Although Crumley stated he built the wrecker and it was not by Holmes, through cross-examination defense counsel attempted to show Crumley was joking with the officers when he made these remarks. From the record we are not certain he succeeded.

out of town, so Crumley paid Spurlin $2000 cash and left with the truck. No testimony was elicited concerning Haynes being present. No bill of sale was written up that day. At a later date which Gann could not remember and Spurlin believed was in January, 1976, a bill of sale was made out to Haynes Auto Parts. Haynes' business tax number was written on the bill of sale allegedly to avoid payment of sales tax on a sale between businesses. Gann also testified he saw both Crumley and Haynes driving the truck after the new wrecker unit was attached.

On July 15, 1976, the day before the wrecker was impounded several law enforcement officers, including Special Agent Sylvester, went to the salvage yard of G. J. Haynes. There they discovered a red cab frame to a 1971 Ford truck, model 350, minus its doors. At that time Lieutenant Ernest Hardigree of the Alabama Bureau of Investigation removed the "track sheet" from the cab. A "track sheet" is a computer printout prepared by the vehicle's manufacturer, listing the parts and accessories with their identification numbers to be used in the assemblage of that vehicle. Each track sheet contains the specifications for each vehicle and indicates that vehicle's identification number (VIN). Upon the vehicle's completion the document is placed in one of several particular locations in the cab known only to the manufacturer and law enforcement officers and thereafter only removed by law enforcement officers when they are unable to determine a VIN in any other way.[3] Within five days this red cab disappeared from Haynes' salvage yard and has not been located.

The track sheet removed from the cab by the police had a VIN F35HCK85721 which matches that of Hardin's truck.

The property on which Haynes' salvage yard was located was owned and leased to him by Tommie Sue Crumley, the defendant's wife. She acquired it in late January, 1976, from Percy Haynes', G. J.'s brother.

The government also offered the testimony of G. J. Haynes. His testimony incriminated Crumley in several respects but at the same time conflicted with the testimony of other government witnesses.

Haynes denied being involved at all in the purchase of the 1972 Ford truck from Gann and Spurlin. He states Crumley purchased it for his own use and that his involvement began in July, 1976, when Spurlin came to his office to have him sign the bill of sale. Haynes stated Crumley had asked him if he could use Haynes' business tax number for tax purposes because he was in trouble with the Internal Revenue Service. Haynes never owned any wrecker for his business but on occasion hired Crumley's for pick-ups and deliveries. Haynes never drove the wrecker.

Haynes also denied Crumley was a partner in his salvage business although Crumley loaned him, through his brother, Percy, $3000, shared in the profits, watched the business on numerous occasions and sold salvaged vehicles to the business.

Haynes also testified Crumley's green pickup truck delivered the red cab to the salvage yard in February or March, 1976, but he stated Crumley was in Percy's shop nearby when the delivery was made. However, later, the defendant told Haynes just to leave the cab alone because another body shop was going to pick it up.

Haynes' conviction and incarceration on a state charge of buying and receiving stolen property were brought out on both direct and cross-examination. He received a ten year sentence in 1975 and, after his appeal failed, was imprisoned July 26, 1976. At the time of trial he was still incarcerated.

On cross-examination by defense counsel Haynes denied knowing anything was stolen until September, 1976, although the record reveals a written report by F.B.I. Agent Sylvester, used on cross-examination for impeachment, in which the agent states he told Haynes in July, 1976, the cab was stolen.

---

**3.** VINs are usually located on the latch wall of a vehicle's door. In this case the doors were missing. There are also usually secondary numbers on the frame of the vehicle.

The first issue raised by Crumley is whether his cross-examination of Haynes to determine his motive in testifying truthfully or untruthfully was erroneously and prejudicially limited by the trial court.

Defense counsel was permitted to question Haynes concerning possible promises made to him by the government:

Q. You said you haven't been promised anything?

A. I haven't been promised anything. I don't know of anything that anybody could promise me. (R. 345)

Later defense counsel proceeded as follows:

Q. You haven't had any prosecution brought against you about this, have you?

A. That's right, no other case.

Q. No other case?

A. No, sir, other than what I am serving time on now.

Q. And when this came out and they talked to you about it didn't they find a stolen Cadillac out there?

Mr. Batcheler: (Assistant United States Attorney): I object to that, Your Honor, whether they did or didn't and I object to going into it and move to exclude any references to it.

Mr. Parker: He mentioned that they hadn't brought any other suit—

A. Not to my knowledge, sir.

Mr. Parker: Or any other prosecution and we are asking him on that occasion when they found the cab out there if they found a stolen Cadillac out there.

The Court: And what are you trying to prove?

Mr. Parker: His motto (sic) to come and not tell the truth today.

The Court: Sustain the objection. You can develop any evidence whether he had been promised anything. (R. 346–347).

The Court then instructed the jury:

The Court: Ladies and gentlemen of the jury, you have heard the witness's (sic) testimony with respect to his own incarceration. You have heard his testimony with respect to his relationship to this defendant. The last question put to the witness could leave an inference that this witness is testifying now because of some promise. Without the independent development of that evidence there would be no basis for the jury to draw such an inference. The Court has ruled that question is improper and you are to disregard the inference in counsel's statement to that effect and you may have your exception, Mr. Parker. (R. 348–349).

An accused's right to cross examine the witnesses against him is encompassed by the confrontation clause of the Sixth Amendment. The Supreme Court in *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974), noted "cross examination is the principal means by which the believability of a witness and the truth of his testimony are tested."

The right of cross-examination protected by the Constitution is especially important in exposing ". . . a witness' motivation in testifying . . ." *Davis v. Alaska, supra,* 415 U.S. at 318, 94 S.Ct. 1105. A trial court's sound discretion limits the scope and extent of cross-examination and an appellate court will only interfere with that ruling if it finds an abuse of discretion. However, this discretion must give due regard to the Sixth Amendment's right of confrontation. *United States v. Mayer,* 556 F.2d 245 (5th Cir. 1977); *United States v. Brown,* 546 F.2d 166 (5th Cir. 1977). The trial court here abused its discretion.

"[C]ross-examination of a witness in matters pertinent to his credibility ought to be given the largest possible scope." *United States v. Partin,* 493 F.2d 750, 763, (5th Cir. 1974), quoting *McConnell v. United States,* 393 F.2d 404, 406 (5th Cir. 1968). It is especially important in a case where a witness or an accomplice may have substantial reason to cooperate with the government that a defendant be permitted to search for an agreement between the government and the witness. *United States v. Mayer,* 556 F.2d 245 (5th Cir.

1977); *United States v. Onori,* 535 F.2d 938 (5th Cir. 1976). "What tells, of course, is not the actual existence of a deal but the witness' belief or disbelief that a deal exists." *United States v. Onori, supra,* 535 F.2d at 945. *Accord United States v. Mayer,* 556 F.2d 245 (5th Cir. 1977); *United States v. Dickens,* 417 F.2d 958, 960–61 (8th Cir. 1969).

■ Here, defense counsel wanted to question Haynes concerning a stolen Cadillac found in his salvage yard at the same time the red cab was found. Defense counsel learned of this discovery from a post interview report prepared by F.B.I. Agent Sylvester summarizing an interview with Haynes.[4]

It is apparent from defense counsel's question he was attempting to determine from Haynes if he had any expectations that his cooperation through testifying would persuade the government not to charge him with possession of the stolen Cadillac. Certainly the fear of additional federal charges and prosecution might motivate a witness to testify favorably on behalf of the government. Even a witness then serving a ten year confinement. Because the district court did not allow the defense sufficient inquiry into Haynes' motivation in testifying for the prosecution we find the full exercise of the accused's Sixth Amendment right to confrontation was frustrated and the trial judge abused his discretion.

■ The district court's error violated Crumley's constitutional right under the Sixth Amendment's confrontation clause. Therefore we must reverse unless we find the error was "harmless beyond a reasonable doubt." *Chapman v. California,* 386

U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1966).[5] After a careful review of the record we are unable to conclude the court's limitation of cross-examination was harmless under *Chapman.* Haynes' testimony was an important factor in the government's case and we cannot find beyond a reasonable doubt that if the jury had not believed Haynes it would not have acquitted Crumley. We therefore reverse and remand for a new trial.

To prevent any problems on re-trial we will also consider the defendant's other assignment of error.

■ Crumley further contends his right to cross-examination under the Sixth Amendment was also unduly limited because one of the government's witnesses was not required to reveal where the track sheet was secreted.[6] Crumley's counsel was permitted to explore whether the track sheet could have been placed in the cab after leaving the manufacturer.

The Fifth Circuit has spoken on the issue of revealing secret identification numbers in *Gurleski v. United States,* 405 F.2d 253 (5th Cir. 1968), *cert. denied,* 395 U.S. 981, 89 S.Ct. 2140, 23 L.Ed.2d 769 (1969), and *Williamson v. United States,* 272 F.2d 495 (5th Cir. 1959), *cert. denied,* 362 U.S. 920, 80 S.Ct. 672, 4 L.Ed.2d 740 (1960), and those decisions can be applied to the secret location of this track sheet. These cases hold the defense must show some materiality before the court will require such information be revealed. The reason for this limitation in cases of secret identification numbers and track sheets is they are valuable tools used by law enforcement officers in discovering and solving motor vehicle thefts.

---

**4.** "It was then pointed out to HAYNES that on July 15, 1976, at the time that State and Federal Investigators were on his property and had recovered a stolen 1973 Cadillac, a 1971 red Ford truck, cab without wheels or engine, was located among the salvaged vehicles located on his lot." (Appendix p. 8–9).

**5.** For a discussion of the application of the harmless error rule to cases involving violations of the Sixth Amendment see footnote 10,

*United States v. Mayer,* 556 F.2d 245, 252 (5th Cir. 1977).

**6.** The witness, Lieutenant Ernest Hardigree, was asked:

Q: Where did you watch Mr. Wilemon pick up that piece of paper?

A: I rather not answer that. (R. 281–284). The government objected and the objection was sustained after a bench conference.

Crumley has not shown in what manner the revelation of the track sheet's location would be material to his case. He suggests that because the identification of the cab as stolen is a material issue, the location of the track sheet is too. We agree that the stolen character of the cab is extremely material but as long as there was no showing during the cross-examination which was permitted, that the track sheet was not placed in the cab after it left the manufacturer, the location of the track sheet was not material.