**Oscar CARRILLO, Petitioner-Appellant,**

v.

**Frank PERKINS, Probation Officer, 81st District Court, and Joe Mattox, Attorney General of Texas, Respondents-Appellees.**

No. 83–1105.

United States Court of Appeals, Fifth Circuit.

Jan. 30, 1984.

Randy Schaffer, Houston, Tex., for petitioner-appellant.

Barbara J. Lipscomb, J.D. Hooper, Asst. Attys. Gen., Austin, Tex., for respondents-appellees.

Before RUBIN and RANDALL, Circuit Judges, and SEAR *, District Judge.

ALVIN B. RUBIN, Circuit Judge:

The question for decision is whether in the trial of a state criminal case a restriction placed on the defendant's cross-examination of a prosecution witness violated the defendant's right to confront witnesses against him. Notwithstanding the presumption of correctness attached to the state court's findings of fact, we find that the restriction impermissibly confined impeachment. Nevertheless, because we find this error harmless beyond reasonable doubt, we affirm the denial of a writ of habeas corpus.

## I.

Oscar Carrillo was convicted in a Texas court of felony theft for using the postage meter of the Benavides Independent School District to affix postage to his campaign materials without reimbursing the School District.[1] Rodolfo Couling, the School District tax assessor-collector, testified at the trial that, at Carrillo's request, he instructed tax office employees to address envelopes provided by Carrillo and stuff them with campaign pamphlets, and then, with the assistance of one of his employees, he ran the envelopes through the School District postage meter. Carrillo did not reimburse Couling or the School District for the postage used to mail his campaign literature. Carrillo was not present when the envelopes were run through the postage meter, but, according to Couling, he did come to the tax office several times while the envelopes were being processed to see how things were going.

The trial judge held that Couling was an accomplice-witness. Therefore, under Texas law, Couling's testimony did not suffice for Carrillo's conviction unless "corrobo-

rated by other evidence tending to connect the defendant with the offense committed; '... corroboration is not sufficient if it merely shows the commission of the offense." Tex.Crim.Proc.Code Ann. art. 38.14 (Vernon 1979).

The Texas Court of Criminal Appeals found that two witnesses other than Couling—Ruben Chapa and Brian Taylor—connected Carrillo with the offense. Chapa, a Carrillo campaign worker, testified that Carrillo gave him a box of envelopes containing campaign materials and told him to take them to Couling who would "know what to do with them." He delivered the envelopes to Couling at the School District tax office and watched Couling run them through the postage meter. Chapa also testified that he had seen Couling and another School District employee run campaign envelopes through the postage meter on another occasion. Taylor, who was then superintendent of the San Diego Independent School District, testified that Carrillo asked his assistance in mailing campaign materials. Taylor agreed to help and subsequently instructed employees of his district to stuff and address Carrillo's literature and mail it with stamps purchased by the district. Carrillo was not indicted for theft of these stamps; the inquiry was permitted for the purpose of corroborating Couling's testimony that Carrillo obtained postage without payment from the Benavides School District. In response to the prosecutor's attempts to elicit the necessary connection, Taylor replied, "[Carrillo] said Benavides Independent School District was helping him and could I?," and "[Carrillo] said, 'can the school help mail out some of the campaign literature because Benavides is helping.'" The state appellate court found the testimony of these two witnesses sufficiently corroborative of Couling's testimony to support Carrillo's conviction. *Carrillo v. State,* 591 S.W.2d 876 (Tex.Crim.App. 1979).

---

* District Judge of the Eastern District of Louisiana, sitting by designation.

1. Carrillo, a member of the Texas House of Representatives, was campaigning for a seat in the state Senate.

Taking the stand in his own defense, Carrillo testified that he had never asked Couling for any kind of assistance. He acknowledged that Chapa was a paid campaign worker, but denied giving him any campaign materials to take to Couling. According to Carrillo, he spent most of his time campaigning away from home and therefore did not know the details of how his campaign materials had been mailed. He denied knowing that employees of the School District tax office were stuffing envelopes and that the postage meter was being used on his materials. He acknowledged employing as a legislative aide a woman named Grace Bridges, and said that, though he knew that she had assisted his family with the campaign, he did not know exactly what she had done. In particular, Carrillo denied instructing Bridges to take campaign materials to the School District tax office, and explained that, if she had done so, it was without his knowledge. Questioned specifically about postage expenses for his campaign, Carrillo produced a $200 check to Chapa (written by Carrillo's wife) and a $250 check to a man named Barrera, which Carrillo said was to satisfy Taylor's request for reimbursement.

On a motion made by the state in limine, Carrillo was barred from impeaching Chapa through cross-examination concerning unadjudicated criminal offenses. Carrillo made a proffer of evidence as follows. Chapa first made a written statement incriminating Carrillo in 1976. In 1974, before he made this statement, the Texas Ranger in charge of investigating Carrillo accompanied a policeman to the service station then being operated by Chapa, where they questioned Chapa about some stolen rifles. Chapa admitted that he had bought several stolen rifles, had given two of them to his brothers, and had kept the rest. He retrieved the two rifles from his brothers and thereafter returned sixteen rifles to the county sheriff. No charges had been filed against Chapa at the time of Carrillo's trial. Chapa said that he knew he had committed a felony, however, and acknowledged that

charges could still be filed against him. He would testify that he had thought about his exposure to prosecution for this offense while testifying against Carrillo. Carrillo also sought to establish that the state had actually agreed not to prosecute Chapa, but Chapa denied any such agreement.

The jury found Carrillo guilty and sentenced him to seven years' probation. His conviction was affirmed by the Texas Court of Criminal Appeals. *Carrillo v. State,* 591 S.W.2d at 887. The state appellate court held that the trial court had acted within its discretion in excluding the proffered impeachment testimony. It reasoned that any pressure Chapa may have felt to testify favorably for the state was speculative; because no deal was in fact made, cross-examination was properly restricted. Although Carrillo urged that the restriction violated his constitutional right to confront witnesses against him, the court did not mention this contention in its opinion. Habeas relief was denied by the federal district court.

## II.

Carrillo contends that his right to confront adverse witnesses was violated by the trial court's refusal to allow him to cross-examine Chapa regarding the stolen rifles and Chapa's vulnerability to prosecution at the time he testified. This testimony might show that Chapa was biased against him or had a motive to lie: the jury might have inferred that Chapa had a personal stake in assisting the state in order to avoid prosecution for possession of stolen property. According to Carrillo, only Chapa corroborated Couling's testimony, so effective impeachment of Chapa might have foreclosed jury consideration of the very incriminating testimony Couling gave.

In *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Supreme Court held that the sixth amendment right of an accused to confront the witnesses against him, made applicable to the states by the fourteenth amendment,[2] requires

2. *Pointer v. Texas,* 380 U.S. 400, 404, 85 S.Ct.       1065, 1068, 13 L.Ed.2d 923 (1965).

that a defendant in a state criminal case be allowed to impeach the credibility of a prosecution witness by cross-examination directed at showing that the witness is under probation for a prior criminal conviction. The Court explained how a witness's credibility can be attacked by revealing his possible biases, prejudices, or ulterior motives and declared the exposure of testimonial motivation "a proper and important function of the constitutionally protected right of cross-examination. 415 U.S. at 316, 94 S.Ct. at 1110, 39 L.Ed.2d at 353.[3] The right to probe motivation was violated even though the trial court permitted defense counsel to question the witness about his concern that the police would suspect he was involved in the crime.

> [I]t seems clear to us that to make ... inquiry [into the witness's credibility] effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. Petitioner was thus denied the right of effective cross-examination which " 'would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.' *Brookhart v. Janis,* 384 U.S. 1, 3, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314." *Smith v. Illinois,* 390 U.S. 129, 131, 88 S.Ct. 748, 750, 19 L.Ed.2d 956 (1968).

*Id.* at 318, 94 S.Ct. at 1111, 39 L.Ed.2d at 354. Although the witness had been convicted while a juvenile, the state's interest in protecting the confidentiality of a juvenile offender's record could not "require yielding of so vital a constitutional right as the effective cross-examination for bias of an adverse witness." *Id.* at 320, 94 S.Ct. at 1112, 39 L.Ed.2d at 355.

This circuit has interpreted *Davis* to require reversal of a conviction if the trial judge forbids cross-examination concerning why prosecution witnesses had entered guilty pleas and agreed to testify against the accused. *United States v. Mayer,* 556 F.2d 245 (5th Cir.1977). Quoting both a prior Fifth Circuit and a Supreme Court decision, Judge Wisdom wrote,

> cross-examination of a witness in matters pertinent to his credibility ought to be given the largest possible scope ... especially ... where a prosecution witness has had prior dealings with the prosecution or other law enforcement officials, so that the possibility exists that his testimony was motivated by a desire to please the prosecution in exchange for the prosecutor's actions in having some or all of the charges against the witness dropped.

*Id.,* 556 F.2d at 248–49. The trial judge's discretionary authority to limit cross-examination "comes into play only after there has been permitted as a matter of right sufficient cross-examination to satisfy the Sixth Amendment." *Id.,* 556 F.2d at 250 (citation omitted).

■ Because the Texas Court of Criminal Appeals held that Chapa's testimony was properly excluded, we must consider the effect of that decision in view of the rule that a federal habeas court must, under 28 U.S.C. § 2254(d), accord a "presumption of correctness" to factual determinations made by state appellate courts. *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). The state court made two factual findings regarding the probative value of the testimony. The court found first that, because the record contained no evidence of pending charges or an agreement between the state and Chapa, the possibility of pressure from the state was speculative and, therefore, "of little probative value as impeachment." 591 S.W.2d at 887. It also found that the probative force of the excluded testimony was minimized by Chapa's cross-examination on other subjects, which the trial court did permit. This evidence included Chapa's testimony that he held Carrillo responsible for the firing of a friend and a sister from the School District and that Carrillo had refused to support him in an unsuccessful campaign for the Benavides City Council. Because these findings are plainly factual and were made after a "hearing on the merits," they are

---

**3.** *Accord United States v. Hall,* 653 F.2d 1002, 1007–08 (5th Cir.1981).

entitled to the "presumption of correctness" mandated by *Sumner* and § 2254(d).

Deference to these findings, however, does not require us to determine that Carrillo's sixth amendment rights were observed despite the limitation on cross-examination of Chapa. Although Carrillo's opportunity to elicit testimony about Chapa's personal animosity may be relevant in assessing harm occasioned by the error, it does not necessarily mean that Carrillo was able to develop the issue of bias adequately. A witness's personal enmity toward a defendant is only one source of bias; that same witness also may harbor a desire to curry favor with the state. A jury might conclude that the latter motive was more potent than personal animus or political vendetta and that the threat of prosecution would make Chapa less faithful to his oath of honesty than would those other motives.

The fact that Chapa was never charged with the offense does not diminish the constitutional significance of this evidence. Chapa acknowledged that he was still subject to prosecution and that he thought about it while testifying. As we noted in *United States v. Crumley,* 565 F.2d 945, 950 (5th Cir.1978), "[c]ertainly the *fear* of additional federal charges and prosecution might motivate a desire to testify favorably on behalf of the government." (Emphasis added.) For that reason, we found in *Greene v. Wainwright,* 634 F.2d 272 (5th Cir.1981), that a *restriction on efforts to elicit testimony about criminal incidents* in a prosecution witness's recent past violated the defendant's sixth amendment right to confront accusers. 634 F.2d at 275–76. *See also United States v. Croucher,* 532 F.2d 1042, 1045 (5th Cir.1976).

Although it acknowledged the importance of evidence that might have been produced, the district court found that Carrillo's *right* to cross-examination was not unconstitutionally restricted because he did not avail himself of the opportunity to ask Chapa directly about any promise or agreement with the state. We agree with Carrillo that this reasoning is unsound because it "places the cart before the horse." If Carrillo had

simply asked Chapa whether he had struck some deal with the state, "the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness...." *Davis v. Alaska,* 415 U.S. at 318, 94 S.Ct. at 1111, 39 L.Ed.2d at 355. In *Davis,* defense counsel elicited from the government witness a denial that he feared the state would suspect him of the crime for which the defendant was being tried. 415 U.S. at 311–313, 94 S.Ct. at 1108–09, 39 L.Ed.2d at 350–51. That fear is what counsel wanted the jury to infer from questions about the witness's juvenile conviction and probationary status. The Supreme Court found the confrontation right violated because cross-examination on this theory could not be effective without exposure of the underlying facts. As the violation in *Davis* withstood counsel's asking the ultimate question, the violation here exists notwithstanding counsel's decision not to ask the ultimate question. To make inquiry into Chapa's fear of prosecution effective, Carrillo should have been permitted to probe into the reasons Chapa might have been biased in favor of the state. Therefore, "the trial judge never reached the point at which he had the discretion to limit the scope of cross-examination." *United States v. Mayer,* 556 F.2d at 250.

Moreover, whether Chapa had made a deal with the state is not dispositive. His denial of such an agreement during his voir dire examination—even if believed—does not make cross-examination concerning possible bias unwarranted or irrelevant. "[A] defendant's right to cross-examine a witness about any deals that may have been made or any understandings that may have been reached ... [with the government] does not hinge on whether *in fact* any such deals or understandings were effected." *United States v. Mayer,* 556 F.2d at 249 (emphasis in original). Rather,

[w]hat counts is whether the witness may be shading his testimony in an effort to please the prosecution. "A desire to cooperate may be formed beneath the conscious level, in a manner not apparent

even to the witness, but such a subtle desire to assist the state nevertheless may cloud his perception."

*Greene v. Wainwright,* 634 F.2d at 276 (quoting *Burr v. Sullivan,* 618 F.2d 583, 587 (9th Cir.1980)). Thus, the crucial factor is whether the jury might have been persuaded that Chapa's vulnerability to prosecution made him wish to assist the state and that this motivation compromised his credibility. Because Chapa's damaging statement came on the heels of a "visit" by two policemen, including one Chapa knew was involved in the Carrillo case, the jury might well have inferred that Chapa possessed a "subtle desire" to curry the state's favor. Yet, Carrillo was denied the opportunity to expose the jury to these facts. The limitations on cross-examination of Chapa were erroneous under the sixth amendment as interpreted by *Davis* and by our prior decisions.

The limitations cannot be justified by our decisions in *United States v. Hawkins,* 661 F.2d 436 (5th Cir.1981), *cert. denied,* 456 U.S. 991, 102 S.Ct. 2274, 73 L.Ed.2d 1287 (1981) and *United States v. Benavidez,* 664 F.2d 1255 (5th Cir.1982), *cert. denied,* 457 U.S. 1121, 102 S.Ct. 2936, 73 L.Ed.2d 1334 (1982). The government witnesses in those cases were not, like Chapa, subject to prosecution by the same agency prosecuting the defendants. They were witnesses in federal cases who were shielded from cross-examination regarding prior arrests by a state and a foreign county. Moreover, the witnesses had agreed to testify for the govern-

ment against the defendants long before their own arrests, and they had already been released (with fines paid or charges "scheduled to be dismissed") before testifying.

### III.

The state contends that, if the ruling was in error, the error was harmless. This requires us to consider whether, notwithstanding the categorical statement to the contrary in *Davis,*[4] denial of the confrontation right can ever be excused as harmless and, if so, whether the error was so innocuous here. The assertion in *Davis* that "no amount of showing of want of prejudice would cure" denial of the right to confront accusers is arguably dictum: the *Davis* Court simply included this language in a quote from prior decisions,[5] and it described the testimony of the witness whose cross-examination was restricted as a "crucial link" in the defendant's conviction. 415 U.S. at 318, 94 S.Ct. at 1111, 39 L.Ed.2d at 354.[6] The structure of the *Davis* opinion suggests, however, that characterization of the testimony as "crucial" may have been insignificant: the Court did not consider the importance of the witness's testimony *after* it concluded that the confrontation right had been violated, as presumably it would have if analyzing harm attributable to the error.

Nevertheless, after *Davis* we have repeatedly applied the harmless-error rule in decisions finding violations of the right of effective cross-examination.[7] In *United*

---

**4.** "Petitioner was thus denied the right of effective cross-examination which 'would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.'" 415 U.S. at 318, 94 S.Ct. at 1111, 39 L.Ed.2d at 354 (quoting *Brookhart v. Janis,* 384 U.S. 1, 3, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314, 315, and *Smith v. Illinois,* 390 U.S. 129, 131, 88 S.Ct. 748, 750, 19 L.Ed.2d 956, 958 (1968).

**5.** The no-harm rule entered federal jurisprudence as a concession in a respondent-state's brief, quoted by the Supreme Court in *Brookhart v. Janis,* 384 U.S. 2, 86 S.Ct. 1245, 16 L.Ed.2d 316 (1966). The Court later recited the language as axiomatic in *Smith v. Illinois,* 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968), as it did again in *Davis. Brookhart* presented the

Court with a complete denial of cross-examination. In *Smith,* the prosecution's principal witness simply refused to state his correct name and address, though he did answer other questions.

**6.** *See* Note, *Constitutional Restraints on the Exclusion of Evidence in the Defendant's Favor: The Implications of* Davis v. Alaska, 73 Mich.L.Rev. 1465, 1469–72 (1975).

**7.** The First, Seventh, and District of Columbia Circuits also apply the harmless-error rule notwithstanding the *Davis* statement. *United States v. Gambler,* 662 F.2d 834, 840–42 (D.C. Cir.1981); *United States ex rel. Scarpelli v. George,* 687 F.2d 1012, 1013–14 (7th Cir.1982),

*States v. Brown,* 546 F.2d 166, 172–73 (5th Cir.1977), we affirmed the defendant's conviction, notwithstanding our finding that the confrontation right had been violated, because we found the error harmless beyond reasonable doubt. We reversed the conviction in *United States v. Crumley,* 565 F.2d 945 (5th Cir.1978), but we did so as a consequence of being unable to find the violation in that case harmless beyond a reasonable doubt. Although our opinions in *Brown* and *Crumley* do not explain how *Davis* might affect harm analysis, they leave no doubt that our panels were attentive to the precedent, for we relied on *Davis* in finding constitutional error in both cases.

We quoted the "no want of prejudice" passage from *Davis* after finding a sixth amendment violation in *Greene v. Wainwright,* 634 F.2d 272, 276–77 (5th Cir.1981), but that case gave us no occasion to determine whether a harmless error would warrant reversal, for the witness whose cross-examination was limited gave crucial testimony as the state's chief witness. 634 F.2d at 275. In *United States v. Meacham,* 626 F.2d 503, 511 (5th Cir.1980), *cert. denied,* — U.S. —, 103 S.Ct. 455, 74 L.Ed.2d 608 (1980), we cited *Davis* as authority for the proposition that, "[w]here an error in refusing to allow a defendant to cross examine a witness has a great adverse effect on the defense, the error cannot be considered harmless." This declaration can be interpreted either as a simple tautology or as establishing that, if a restriction prejudices the defendant's ability to impeach a prosecution witness to the extent that the confrontation right is violated, the error requires reversal notwithstanding its harmlessness.[8] But if our *Meacham* panel intended the latter, notwithstanding the contrary holding of *Brown,* the pronouncement is without precedent, as the sixth amendment analysis in *Meacham* was superfluous to the decision.[9]

In *United States v. Mayer,* 556 F.2d 245, 252 & n. 10 (5th Cir.1977), we held that partial denial of the confrontation right does not require reversal if the error was "harmless beyond reasonable doubt."[10] In acknowledging the apparent departure from *Davis,* we distinguished "the *complete* denial of access to an area that is properly the subject of cross-examination" from partial restriction of cross-examination in such an area. 556 F.2d at 252 n. 10 (emphasis in original). A careful reading of *Davis,* however, makes this distinction tenuous. Defense counsel in *Davis* was permitted to examine the witness concerning his fear that he would be held responsible for the crime with which the defendant was being charged; what was excluded was testimony about whether the witness was on probation for a juvenile conviction (sought by defense counsel to show that the testimony was colored by the witness's fear that he would be suspected or that his probation would be revoked). Because *Davis* arose from a restriction that permitted partial inquiry into this proper subject of cross-examination, the distinction we drew in *Mayer* appears insignificant.[11] Therefore, inter-

---

8. This rule was recently adopted by the Ninth Circuit. In deference to *Davis,* that court held in *Chipman v. Mercer,* 628 F.2d 528, 533 (9th Cir.1980), that violation of the confrontation clause requires reversal without consideration of whether the error was harmless. *Accord, United States v. Uramoto,* 638 F.2d 84 (9th Cir.1980). The *Chipman* court explained, however, that the confrontation right is violated only by meaningful restrictions on cross-examination concerning subjects of considerable relevance. 628 F.2d at 533. This is the analysis we articulated in *supra* part II.

*cert. denied,* — U.S. —, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1982); *Kines v. Butterworth,* 669 F.2d 6, 11–13 (1st Cir.1981), *cert. denied,* 456 U.S. 980, 102 S.Ct. 2250, 72 L.Ed.2d 856 (1981).

9. In *Meacham,* we analyzed the confrontation clause issue after disposing of the appeal on other grounds, to instruct the trial court how to proceed in the event of reindictment.

10. We derived this test from *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1966), which antedates *Davis* by eight years.

11. *Brookhart v. Janis* further undermines our complete-denial/partial-restriction distinction. In *Brookhart,* the Supreme Court recited the rule that harm need not be shown and immediately observed that, "[i]n the present case there was not, to be sure, a complete denial of all right of cross-examination." 390 U.S. at 131, 88 S.Ct. at 750, 19 L.Ed. at 959.

preting *Mayer* as establishing a rule broader than its holding—that harmless error does not warrant reversal, at least when cross-examination is only partially restricted—cannot be justified.

■ We are of course bound to follow *Brown, Crumley,* and *Mayer,* however incompatible they may seem with the *Davis* statement, for "[t]he firm rule in this circuit is to adhere to a prior panel's decision absent *intervening* contrary authority from the Supreme Court or our en banc court." *Robinson v. Parsons,* 560 F.2d 720, 721 n. 2 (5th Cir.1977) (emphasis added). Carrillo was permitted to ask Chapa whether he had made a deal with the state, but was forbidden to question Chapa about the circumstances that might have led to any agreement or unilateral effort to curry favor with the state. For this partial restriction, our post-*Davis* decisions uniformly hold that reversal is not appropriate if the error was harmless beyond reasonable doubt.

■ Our reading of the record persuades us that, under this standard, reversal is unwarranted. Evidence that some of Carrillo's campaign materials were mailed with unreimbursed postage was uncontroverted at trial save for Carrillo's attempt to attribute checks given to Taylor and Chapa, which we discuss below. The Benavides Postmaster testified that in May 1972, 5,000 Carrillo campaign envelopes were brought to the Benavides Post Office bearing metered postage. The only postage meter in Benavides was that of the School District.

When Carrillo testified in his own behalf, he attempted unsuccessfully to document the purchase of sufficient postage to mail his literature. He said that he had purchased stamps for his campaign in twenty-dollar rolls, but the Jordantown postmaster testified that, during Carrillo's campaign, first-class stamps were not available in such rolls. Carrillo also said that he had given his friend, A.V. Barrerra, $200 to reimburse Taylor for postage he had supplied; Barrerra, however, testified that, when he was in a financial bind, Carrillo wrote the $200 check to him as a loan. Carrillo also testified that he gave Chapa $250 to cover expenses, including postage. Chapa said this was paid as compensation for other expenses, not postage. In any event, the sum of $250 was far short of the amount of metered postage. In short, Carrillo's testimony on the subject of postage fails to establish even a plausible case of payment.

Ample evidence was adduced to show that Couling's campaign materials were stuffed and addressed by School District employees. Gordon Ross testified that, when he was Superintendent of the School Board, he observed Grace Bridges (a full-time employee of the School District and part-time employee of Carrillo's legislative office [12]) prepare Carrillo's campaign materials in the School Board office for mailing during her duty hours. He also testified that he saw two other School District employees, Irma Garcia and Minerva Casas, addressing Carrillo's envelopes in the School District office during regular working hours. Luis Elizondo, a former School Board member, testified that, while working in his private office in the School District headquarters, he heard Bridges answer the telephone, "State Representative Carrillo's secretary." He too saw School District employees packing envelopes with Carrillo's campaign materials in the School District tax office during normal working hours under Bridges's supervision. Maria Raymond and Minerva Casas testified that they typed addresses on Carrillo's campaign envelopes while employed at the Tax Office, and that Arnoldo Ramos (another School District employee) also addressed Carrillo's envelopes for Bridges.

Carrillo denied knowing that his campaign materials were being processed in any way by workers at the School District offices. Maria Raymond testified to the contrary, however, that Carrillo had thanked her after the campaign "for what we had done there at the office." Raymond's testi-

---

12. Bridges was employed by the School District to keep records on student attendance. Although she had no legal training, she was also employed part-time as Carrillo's legislative briefing clerk.

mony does not reveal that she knew Carrillo's envelopes were being run through the postage meter, so Carrillo's thanks do not necessarily demonstrate his knowledge of the offense.

Chapa was not the only witness to directly incriminate Carrillo, however. Rodolfo Couling, the tax assessor-collector, testified that he personally ran envelopes through the postage meter at Carrillo's request. This testimony was more incriminating than Chapa's, which merely recounted Carrillo's instructions to take campaign materials to Couling, who would "know what to do with them." Because Couling was an accomplice-witness, his testimony could not be considered unless corroborated by another witness. The Texas Court of Criminal Appeals held Couling's testimony corroborated both by Chapa and by Taylor. Although Taylor's testimony was ambiguous as to whether Carrillo knew about or was responsible for the use of Benavides School District postage, the state appellate court held it sufficiently corroborative under state law to support Carrillo's conviction. Thus, the jury could have considered Couling's testimony even if Chapa had not testified at all.

Even if Chapa's testimony is disregarded in its entirety, the evidence of Carrillo's guilt is overwhelming. We conclude that the restriction on cross-examination of Chapa, though impermissible under the confrontation clause, was harmless beyond reasonable doubt.

Therefore, the district court's denial of a writ of habeas corpus is AFFIRMED.