Olin Grimsley, the appellant, was indicted for the capital offense defined in Ala. Code 1975, § 13A-5-40(a)(2), involving the murder and robbery of 68-year-old Ella Foy Riley. He was convicted of the lesser included offense of murder and was sentenced to life imprisonment.[2] The appellant raises 16 issues on this appeal from that conviction.
 I.
The appellant argues that his pretrial motion to dismiss the indictment should have been granted because the State violated his attorney-client privilege by obtaining a statement made by the appellant to an investigator for a prospective defense counsel. A hearing was held on this motion on June 14, 1992.
John Gormley testified at this hearing that he was "self-employed" as a paralegal and that he "work[ed] with the law firm" of Parkman and Brantley, R. 282, and had an office *Page 549 
in the building occupied by that law firm. He also operated the Southern Bureau of Investigation, which employed Lyn Stokes as an investigator. Gormley testified that in July 1990, he "was contacted by telephone by someone purporting to be a member of the [appellant's] family, asking if we [attorney John Parkman and Gormley] would go talk to Mr. Grimsley, and I allowed that we would." R. 293. Gormley testified that one of his "primary duties" for the law firm would have been the initial client contact with the Grimsley family. R. 292. Gormley sent Investigator Stokes to the Henry County jail to advise the appellant "what the fee would be and ascertain how he would be able to pay that and if he would be able to pay it, anything else." R. 297. The conversation between Stokes and the appellant occurred in July 1990.
The evidence against the appellant was entirely circumstantial. The appellant's first trial resulted in a mistrial in January 1992 due to a hung jury. C.R. 7, 626.
Sometime after that, Assistant District Attorney Scott Hedeen mentioned to Rex Tipton, an investigator for the Henry County Sheriff's Office, that "someone needed to talk to Lyn [Stokes] about some information." R. 310. On February 21, 1992, Tipton tape-recorded a statement made by Stokes concerning Stokes's July 1990 conversation with the appellant. Two or three days later, Tipton "briefly told [Hedeen] what Lyn had told [him] and told [Hedeen that he] had the tape and [that] it was available." R. 313. There was testimony that Tipton did not discuss this matter with District Attorney Douglas Valeska. Furthermore, Tipton stated that Assistant District Attorney Hedeen told him that "the statement couldn't be used on account of the privilege that the attorney/client has," although there was an indication that Hedeen did not make such a statement. R. 319.
In that statement[3], which consists of three and one-third typewritten pages, Tipton indicated that he thought Stokes "worked for a law firm, I believe it is Parkman and Brantley, in Dothan, Alabama." Stokes told Tipton that the appellant related the following:
 "[H]e was being charged with capital murder, a murder he did not commit and that the other Defendant had picked Mr. Grimsley up sometime that day, that they had rode around and had bought some crack cocaine from a location that he did not advise me of and they had smoked crack cocaine and they had run out of money. And the other Defendant advised him he knew where he could get some money and they went to a house of a woman that the Defendant used to work for, to cut yards, and upon arriving there both of the subjects went up to the house and the other Defendant talked to the lady that came to the door. Was an older white female and that both subjects went in the house with the white female, and that he asked the white female if he could use her phone to make a phone call and she told him yes. And that he went — . . . Said that he went to the telephone, picked up the receiver and started dialing a number, and Mr. Grimsley said that while he was dialing the number, he heard a noise, and that he turned around and looked and saw the other Defendant had this white female around the throat and that he saw blood coming out of her and that he got scared and dropped the phone and ran back outside to the car and got in the car and waited there until the other Defendant came back out to the car and got into the car and then they drove off. He just kept reiterating that uh, he didn't touch the woman and that uh, and that was why he wanted an attorney to get him out of this, and he didn't think it would be any problem."
On June 8, 1992, Assistant District Attorney Hedeen first informed defense counsel of the existence of the tape. Tipton testified that no one mentioned the tape to him until June 10 or 11, 1992, when defense counsel came to his office, requested, and was given a *Page 550 
copy of the tape. R. 316-17. He stated that "to my knowledge, once I took the tape, nobody has ever heard the tape. It's been locked up in my office and I am the onliest one that has the key." R. 317. However, it appears that, after the appellant's first trial, Stokes did mention or discuss the appellant's statement with at least one law enforcement officer.
The appellant's retrial began on June 15, 1992. The appellant was prosecuted by District Attorney Valeska and Assistant District Attorney Scott Hedeen. The appellant was not represented by any member of the law firm of Parkman and Brantley or by anyone Gormley worked for. Parkman and Brantley was never retained to represent the appellant.
At the hearing on the motion to dismiss, the district attorney stated that "the state has no intention of offering — I have never seen what's in this statement, never listened to any tape . . . . [W]e are not offering this. Seems to me the motion to dismiss is moot." R. 323. As an alternative to dismissing the case, defense counsel "move[d] to disqualify the Assistant District Attorney [Heeden] from the case." R. 330.
At the close of the hearing, the trial court made the following ruling:
 "Okay. Just to clear the rulings, I am ruling that the statement is inadmissible, because it was taken at least probably under the umbrella of the attorney/client privilege, although I have some questions about the paralegal for the lawyer sending someone from his private investigation firm and the lawyer — there's no testimony that the lawyer even knew about it specifically. I mean, it may be a common practice. But, it doesn't sound like someone that was directly dispatched from the lawyer to take a statement on behalf of the lawyer, or to investigate the case on behalf of the lawyer. But I'll accept that it — I'll give the defendant the benefit of the doubt and the ruling that the statement is inadmissible as a violation of the attorney/client privilege." R. 336-37.
The attorney general relies on procedural bar and does not address the merits of this argument. Although the trial court did not specifically deny the appellant's motion to dismiss or the alternative motion to disqualify the assistant district attorney from the case, it is apparent to this Court from the comments of the trial judge during the hearing on the motion to dismiss that both of those motions were effectively denied.
Where a state intrudes into a defendant's attorney-client privilege and learns defense strategy, the dismissal of the indictment may be the only viable remedy. Graddick v. State,408 So.2d 533, 547 (Ala.Cr.App. 1981), cert. quashed,408 So.2d 548 (Ala.), cert. denied, 458 U.S. 1106, 102 S.Ct. 3483,73 L.Ed.2d 1366 (1982).
 "Once a defendant's right to counsel has attached, government intrusion into the attorney-client relationship violates the Sixth Amendment if the defendant can show that there is a realistic possibility she was prejudiced by that intrusion. In Weatherford v. Bursey, [429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977) ], the Supreme Court rejected the proposition that an undercover government agent's attendance at a meeting between the defendant and defense counsel constituted a per se violation of the right to counsel. Instead, the Court suggested four factors relevant to the determination of whether the defendant suffered injury from the intrusion: (1) the purposefulness of the government intrusion; (2) whether any evidence offered at trial was obtained directly or indirectly from the intrusion; (3) whether the prosecutor obtained any details of the defendant's trial preparation or defense strategy; and (4) whether the overheard conversations had been used in any other way to the substantial detriment of the defendant.
 "In United States v. Morrison, [449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981) ], the Supreme Court addressed the issue of the proper remedy for government intrusion. The Court held in Morrison
that even a deliberate government intrusion into the attorney-client relationship did not warrant dismissal of the indictment in the absence of 'demonstrable prejudice, or substantial threat thereof.' Analogizing to Fourth and Fifth Amendment cases, the *Page 551 Morrison Court stated that '[t]he remedy in the criminal proceeding is limited to denying the prosecution the fruits of its transgression.' "
Project, Twenty-Second Annual Review of Criminal Procedure:United States Supreme Court and Courts of Appeals 1991-1992, 81 Geo.L.J. 1295-97 (1993) (footnotes omitted). See also 2 W. LaFave and J. Isreal, Criminal Procedure § 11.8(c) at 7376 (1984).
In Graddick, this Court distinguished Morrison:
 "We recognize that in United States v. Morrison, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981) the Supreme Court held that dismissal of the indictment was inappropriate where the violation of the defendant's Sixth Amendment rights had no adverse impact upon the criminal proceedings: 'More particularly, absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate.'
 "However, the 'substantial threat' of prejudice resulting from the unlawful disclosure of defense strategy to the government obtained in violation of the attorney-client confidential relationship is obvious, definite and apparent.
 "Morrison did not involve a similar factual situation to the case at bar and in Morrison there was no allegation or showing that the violation of the defendant's Sixth Amendment rights had prejudiced the quality or effectiveness of the defendant's legal representation. We do not think that the 'taint' of the violation of the appellant's Sixth Amendment rights can be 'neutralized' under the facts of this case."
Graddick, 408 So.2d at 547-48.
We adhere to our holding in Graddick that any unlawful disclosure of defense strategy to the government obtained in violation of the attorney-client confidential relationship requires a dismissal of the indictment. However, in this case, the prosecution's action is not ground for reversal because there has been no showing that the investigator fell within the umbrella of the attorney-client privilege.
In Alabama, the attorney-client privilege "applies to communications made by a person to an attorney with a view to retaining him even though it turns out that such person does not retain the attorney or that the attorney declines the offered retainer." C. Gamble, McElroy's Alabama Evidence § 390.03 (4th ed. 1991). See also Ala. Code 1975, § 12-21-161. "Communications to the clerk of an attorney, in the belief that he is acting in such capacity, have the same privileged status as communications made to the attorney himself." McElroy's, § 390.02. Information acquired by an attorney while acting in a nonlegal capacity, such as as an investigator, is not protected by the attorney-client privilege.
In this case, however, we have a communication made by the appellant to an investigator who was employed by the paralegal, who worked for the attorney and who also had his own investigating firm. Under existing Alabama law, "both statutory and decisional, the only representative held within the scope of the privilege [is] the attorney's clerk." Advisory Committee's Notes to Rule 502(a)(4), Proposed A.R.Evid., as published in Southern Reporter Advance Sheets, 615 So.2d, No. 2, May 13, 1993. See Hawes v. State, 88 Ala. 37, 68, 7 So. 302,313 (1890) ("It is . . . well established law that an interpreter, intermediary, agent, or clerk of an attorney, through whom communications between attorney and client are made, stands upon the same footing as his principal, and will not be allowed to divulge any fact coming to his knowledge as the conduit of information between them. But the rule extends no further than this. . . . The privilege, in other words, is confined to communications between the attorney and his client; and extends to the necessary organs by which such communications are made, but no further."). Here, the investigator was the agent of the paralegal, who was the agent of the attorney. There was no showing that the attorney had any knowledge that his paralegal was using an investigator to make the initial contact with a potential client.
 "Communications to an attorney's law clerk, in the belief that he is acting in a *Page 552 
legal capacity, have the same privileged status as communications to the attorney himself. . . .
". . . .
 "The burden of establishing the privilege rests with the client or with the party objecting to the disclosure of the communication. . . . The client also has the burden of showing that the admission of the privileged information into evidence will be prejudicial to him. . . . Whether a communication is privileged is 'a matter solely within the province of the court to determine.' . . . Because not every communication made by a client to an attorney is privileged, the trial court must first look at the circumstances of the case in connection with the fact disclosed and determine whether the communication was made 'professionally' (i.e., whether it was made professionally is a question of fact for the trial court)."
Richards v. Lennox Industries, Inc., 574 So.2d 736, 739-40
(Ala. 1990).
For these reasons, we find hold the trial court properly denied the appellant's motion to dismiss the indictment and the alternative motion to disqualify the assistant district attorney from prosecuting this particular case.
 II.
We find that the trial court denied the appellant the opportunity to fully cross-examine State's witness Bessie Mae Sanders.
On cross-examination of Ms. Sanders, defense counsel attempted to attack Ms. Sanders' credibility by showing that she was on probation; that she was selling alcoholic beverages, operating a bar, and had committed other acts in connection with the operation of the bar that were in violation of the terms of her probation; and that she had not been arrested for the violation of her probation. Defense counsel sought to establish that the witness had some type of deal or "expected" deal with the State pursuant to which she would not be prosecuted for her probation violation in exchange for her testimony.
 "BY MR. SMITH [defense counsel]: Can I ask her, 'Are you on probation?'
 "BY MR. VALESKA [district attorney]: I object to that, Judge.
 "BY MR. SMITH: Of course I can. This is Brady versus Maryland.
 "BY THE COURT: No, I'll sustain the objection to that. If you do that, you can ask her if she's been arrested or if she's been indicted, ever. I mean it goes on and on." R. 853.
In this ruling, the trial court erred.
While the extent of defense counsel's inquiry into the conditions of the witness's probation could be limited by the trial court, that court could not prevent cross-examination to establish the fact that the witness was on probation.
 "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness. One way of discrediting the witness is to introduce evidence of a prior criminal conviction of that witness. By so doing, the cross-examiner intends to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony. The introduction of evidence of a prior crime is thus a general attack on the credibility of the witness. A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight in his testimony.' 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev. 1970). We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected *Page 553 
right of cross-examination. Greene v. McElroy, 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377
(1959).
 "In the instant case, defense counsel sought to show the existence of possible bias and prejudice of Green, causing him to make a faulty initial identification of petitioner, which in turn could have affected his later in-court identification of petitioner.
 "We cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning had counsel been permitted to fully present it. But we do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on Green's testimony which provided 'a crucial link in the proof . . . of petitioner's act.' Douglas v. Alabama, 380 U.S. [415, 419, 85 S.Ct. 1074, 1077, 13 L.Ed.2d 934
(1965) ]. The accuracy and truthfulness of Green's testimony were key elements in the State's case against petitioner. The claim of bias which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of Green's vulnerable status as a probationer, . . . as well as of Green's possible concern that he might be a suspect in the investigation."
Davis v. Alaska, 415 U.S. 308, 316-18, 94 S.Ct. 1105, 1110-11,39 L.Ed.2d 347 (1974) (emphasis added) (footnotes omitted).
Here, the "probation" evidence was offered to show the witness's possible bias, and it "raised the possibility that it gave [the witness] an incentive to cooperate with the prosecutor." Commonwealth v. Cox, 837 S.W.2d 898, 901 (Ky. 1992).
 " '[W]henever a prosecution witness may be biased in favor of the prosecution because of outstanding criminal charges or because of any non-final disposition against him within the same jurisdiction, that possible bias, in fairness, must be made known to the jury. . . . [T]he witness may hope for favorable treatment from the prosecutor if the witness presently testifies in a way that is helpful to the prosecution. And if that possibility exists, the jury should know about it.' "
Commonwealth v. Ocasio, 394 Pa. Super. 100, 574 A.2d 1165, 1167
(1990), quoting Commonwealth v. Evans, 511 Pa. 214,512 A.2d 626, 631-32 (1986). See also State v. Bennett, 550 So.2d 201,204-05 (La.App. 1989) ("[w]e have no doubt in this case that the maximum sentence the witness could have received and the revocation of probation were particular facts which tended to show the bias or interest of this witness"), cert. denied, 554 so.2d 1236 (La. 1990).
In Harris v. State, 632 So.2d 503 (Ala.Cr.App. 1992), affirmed, 632 So.2d 543 (Ala. 1993), the defendant attempted to show that a witness was "still on probation."
 "In the present case, whether the witness was placed on probation arising out of a conviction in another county, i.e., Macon County, does not indicate possible bias in testifying for the State in a case arising out of Montgomery County.
 " ' "It is generally held, even in jurisdictions where such evidence is not ordinarily admissible, that the fact that a witness has been arrested or charged with crime may be shown or inquired into where it would reasonably tend to show that his testimony might be influenced by interest, bias, or a motive to testify falsely. This principle has been held applicable in cases where criminal charges are pending in the same court against a witness for the prosecution in a criminal case at the time he testifies, as a circumstance tending to show that his testimony is or may be influenced by the expectation or hope that, by aiding in the conviction of the defendant, he would be granted immunity or rewarded by leniency in the disposition of his own case. But it has been held that the pendency of charges against the witness in another county or jurisdiction cannot be shown under this theory of admissibility." '
 Woodward v. State, 489 So.2d 1, 2-3 (Ala.Cr.App. 1986), quoting 81 Am.Jur.2d Witnesses § 589, at pp. 597-98 (1976).
 "Because the district attorney's office in Montgomery County could not have made *Page 554 
any recommendations toward his sentencing in Macon County, the appellant could not have been helped by testifying in the present case. Nor is there any indication in the record that he was promised any help. Therefore, because the 'extent of cross-examination on irrelevant facts, for the purpose of testing bias or credibility of the witness's testimony, is a matter resting largely in the discretion of the trial court, [whose] ruling will not be disturbed unless it appears that it has abused its discretion to the prejudice of the complaining party,' Beavers v. State, 565 So.2d 688, 689-90 (Ala.Cr.App. 1990), we find no error in the instant case."
Harris, 632 So.2d at 523.
 "In Alabama, a party is entitled to a thorough and sifting cross-examination of the witnesses against him. . . . [T]he trial court is vested with considerable control over the scope of cross-examination, and its rulings thereon will not be reversed in the absence of a gross abuse of discretion that causes substantial injury to the objecting party. . . . The trial court may not, however, limit cross-examination as to a relevant and material matter until the examining party has substantially exercised his right to question the witness thereon."
Perry v. Brakefield, 534 So.2d 602, 607-08 (Ala. 1988). Here, the appellant was entitled to show the jury the circumstances of the witness's situation. See Baker v. State, 568 So.2d 374,377 (Ala.Cr.App. 1990) ("While [the witness] did not have any pending criminal charges against him, . . . he nevertheless believed that the police were investigating him for his possession of drugs. This belief went to his state of mind, and the defense attorneys should have been permitted to disclose his fears and any possible bias.").
 " '[C]ross-examination of a witness in matters pertinent to his credibility ought to be given the largest possible scope.' United States v. Partin, 493 F.2d 750, 763 (5th Cir. 1974), quoting McConnell v. United States, 393 F.2d 404, 406 (5th Cir. 1968). It is especially important in a case where a witness or an accomplice may have substantial reason to cooperate with the government that a defendant be permitted to search for an agreement between the government and the witness. United States v. Mayer, 556 F.2d 245 (5th Cir. 1977); United States v. Onori, 535 F.2d 938 (5th Cir. 1976). 'What tells, of course, is not the actual existence of a deal but the witness' belief or disbelief that a deal exists.' United States v. Onori, supra, 535 F.2d at 945. . . .
 "Here, defense counsel wanted to question Haynes concerning a stolen Cadillac found in his salvage yard. . . .
 "It is apparent from defense counsel's question he was attempting to determine from Haynes if he had any expectations that his cooperation through testifying would persuade the government not to charge him with possession of the stolen Cadillac. Certainly the fear of additional federal charges and prosecution might motivate a witness to testify favorably on behalf of the government."
United States v. Crumley, 565 F.2d 945, 94950 (5th Cir. 1978) (emphasis added).
 "This right is especially important with respect to accomplices or other witnesses who may have substantial reason to cooperate with the government. . . . Indeed, it is so important that the defendant is allowed to 'search' for a deal between the government and the witness, even if there is no hard evidence that such a deal exists. See Grant v. United States, [368 F.2d 658, 661 (5th Cir. 1966) ]."
United States v. Onori, 535 F.2d 938, 945 (5th Cir. 1976). See also United States v. Mayer, 556 F.2d 245, 249 (5th Cir. 1977);National Surety Co. v. Boone, 227 Ala. 599, 603-04,151 So. 447, 450 (1933) (no error in allowing question on cross-examination whether plaintiff had been arrested and was "under sentence").
The trial court violated the appellant's constitutional right under the Sixth Amendment's confrontation clause. See Moody v.State, 495 So.2d 104, 106-07 (Ala.Cr.App.), cert. denied,495 So.2d 110 (Ala. 1986). We cannot conclude that this error was "harmless beyond a reasonable doubt." Chapman v. California,386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The evidence against the appellant was entirely *Page 555 
circumstantial. While that evidence was sufficient to allow the question of the appellant's guilt or innocence to be decided by the jury, that evidence was not overwhelming. Ms. Sanders did not testify at the appellant's first trial, which resulted in a mistrial when the jury was unable to reach a verdict. While her testimony was not the only testimony to place the appellant and codefendant McNair together on the night of the murder, her testimony contradicted the statement the appellant gave to the police after his arrest. Ms. Sanders also testified that later the night of the murder, she saw the appellant at his father's home and the appellant had what appeared to be blood on his T-shirt. A Newport brand cigarette butt was discovered at the scene of the murder. Ms. Sanders testified that the appellant smoked Newport cigarettes and that he had Newport cigarettes in his pocket on the night of the murder. Ms. Sanders's testimony was prejudicial to the appellant. Under these circumstances, we cannot conclude that the error in refusing to permit defense counsel to demonstrate the witness's bias and prejudice was harmless.
 III.
For the same reasons, we hold that the appellant should have been able to cross-examine State's witness Betty Turner as to whether there were outstanding warrants for her husband's arrest and whether she was testifying in an effort to help her husband. The attorney general admits that "perhaps under normal circumstances this would have been relevant," Appellee's brief at 94, but claims that this matter was immaterial in this case because her testimony was substantially the same at the second trial as it was at the first trial and because the warrants for her husband's arrest were issued after her testimony in the first trial.
Contrary to this argument, the fact of the outstanding warrants against Mrs. Turner's husband were admissible to show her bias and prejudice. The weight and credibility of that evidence was for the jury — not the trial judge.
The judgment of the circuit court is reversed for these reasons and this cause is remanded for a new trial or for further proceedings consistent with this opinion. While other issues that are cause for concern are also raised on appeal, we need not address them at this time because it is unlikely that they will be presented again on retrial or because they were not properly preserved for appellate review.
REVERSED AND REMANDED.
All Judges concur.
[2] The appellant's alleged accomplice was Willie McNair. At a separate trial, McNair was convicted of capital murder and sentenced to death. On appeal, his case was remanded for new sentencing hearings before a jury and the trial judge. McNairv. State, [Ms. CR 90-1556, July 24, 1992], 1992 WL 172200 (Ala.Cr.App. 1992).
[3] Although the actual transcript of the statement was "mark[ed]" and "seal[ed] in the record," (R. 306), neither the original transcript nor a copy of the transcript was contained in the record on appeal or retained in the office of the circuit clerk. This Court did obtain a copy of the transcript from one of appellant's counsel.