COURT OF APPEALS OF VIRGINIA

Present: Judges AtLee, Chaney and Frucci
Argued by videoconference


RICHARD RAWLINGS PILAND, A/K/A
 RICHARD RAWLINGS PILAND, III

                                              MEMORANDUM OPINION[*] BY
v.       Record No. 2081-23-4                 JUDGE RICHARD Y. ATLEE, JR.
                                                    APRIL 29, 2025

COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
                          James P. Fisher, Judge

          Erin Harrigan (Jessiah Hulle; Gentry Locke Attorneys, on briefs), for
          appellant.

          Lindsay M. Brooker, Assistant Attorney General (Jason S. Miyares,
          Attorney General, on brief), for appellee.


        Following a jury trial, the trial court convicted Richard Piland of aggravated sexual

battery by mental incapacity or physical helplessness in violation of Code § 18.2-67.3(A)(2).[1]

Piland asserts that the trial court erred by (1) finding the evidence sufficient to support his

conviction, (2) admitting the complaining witness's testimony about a prior incident of bad acts,

(3) excluding testimony by his rebuttal expert witness, and (4) failing to grant a mistrial after the

Commonwealth's attorney made statements during closing argument about Piland's

constitutional rights to counsel and to remain silent. For the following reasons, we affirm.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] The jury acquitted Piland of object sexual penetration.

# I. BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Meade v. Commonwealth*, 74 Va. App. 796, 802 (2022) (quoting *Gerald v. Commonwealth*, 295 Va. 469 472 (2018)). In addition, "we regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence." *Id.* (quoting *Gerald*, 295 Va. at 473).

On the evening of July 24, 2020, C.D.[2] was at Wesley Beddow's house with some of her high school friends. The group was drinking, listening to music, smoking marijuana, and "just hanging out." C.D. consumed "a couple of beers and then a couple of shots" of alcohol. Toward the end of the night, she smoked a "small amount" of marijuana. At some point, Piland appeared at the party. Around midnight, C.D. and a number of other party goers, including Piland, went to Bryce Reinertson's house. Although C.D. knew Piland from school, she did not talk to him or otherwise interact with him.

Upon their arrival at Reinertson's, the group of friends entered the kitchen to make snacks, and then C.D. went downstairs to the basement area to find a place to sleep. She did not have anything else to drink after arriving at Reinertson's house. In the room she chose to sleep in, the bed was against a wall in front of a window. She lay on top of the comforter, still wearing her jean shorts and shirt, rather than get under the blankets. She later recalled that when she fell asleep, the bedroom door was open and lights from inside the bedroom, an adjacent hallway, and the outside porch were on, illuminating the room.

Sometime in the middle of the night, C.D. awoke to "really excruciating pain" in her rectum "that [she] had never felt before." Although dim lighting still seeped into the room from outside, the bedroom door was closed and the lights were turned off. Moreover, although C.D.

---

[2] We refer to the victim by her initials in order to protect her privacy.

had fallen asleep on her stomach, she was now lying on her right side facing the bedroom door, and Piland was lying right behind her. They were both covered by the comforter, and C.D. now only wore her underwear and t-shirt. C.D. "[f]reaked out" and was "really confused" as she jumped off the bed and yelled "what the fuck are you doing." Piland said something like, "I'm sorry, or chill." C.D. wrapped herself up in the comforter, left the bedroom, and lay down on the floor near her ex-boyfriend, Bradley Wacker, who slept reclined in a chair about 15 steps outside the room. C.D. was "really scared." In the morning, she returned to the bedroom to retrieve her shorts and then awoke Wacker and told him that Piland—who by now was no longer in the bedroom—had "raped" her. Shortly thereafter, C.D. got a ride back to her car and went home.

At home, C.D. took off her shorts and t-shirt and left them on the floor. She did not shower or bathe. At around 11:06 a.m., C.D. received a text message from Piland stating,

> I am so sorry for what happened last night and I don't think you know how bad I feel. I honestly don't think I could see what was happening or what I was doing but more than anything, you deserve to be respected. That really was not me and I'm so sorry I left that [i]mpression. Hope we can talk soon.

Just before noon, Piland called C.D. from the same number the text was sent from and apologized. He said he did not know what had gotten into him, "that it wasn't him, that he wouldn't act like that," and that "he was out of his mind." C.D. hung up the phone and called the police.

Shortly thereafter, the police set up a controlled phone call between C.D. and Piland, during which Piland stated that he was very intoxicated, that he did not remember events from the night before, that he did not know how he got into the bedroom, and he agreed he needed help. He also mentioned a similar interaction that occurred between them three years before.

Indeed, at trial, C.D. testified over Piland's objection that in 2017, she was at a house with some high school friends when she went to sleep in one of the beds upstairs. When she

- 3 -

awoke in the morning, C.D. was lying on her side and Piland was right behind her in the bed. She had not invited him to join her in the bed and did not know why he was there. He was putting his fingers inside her. C.D. turned her body away from Piland and pretended to be asleep. She did not confront Piland about it at the time, but after he brought up "the situation from before" during their phone call on July 25, she clarified, "[w]hat, when you did that to me like three years ago . . . [i]s that what you're talking about?" and Piland responded, "yeah."

Molly Nolan was at the party with her friend, Molly Sullivan. Nolan testified that when Piland arrived he "was very explicit and inappropriate" toward her and Sullivan, making "multiple sexual threats toward [them] throughout the night." She added that "something seemed off about his behavior"; he was "very aggressive" and "touchy." Nolan testified that after she went to bed, Piland tried to get into bed with her and touch her, causing one of the other boys at the party to push Piland out of the room and lock the door. The next morning, Nolan overheard Piland on a phone call telling someone that he was sorry for what he had done to C.D.

Sullivan testified that Piland asked her and Nolan for "coke" and when they said no, he "kind of got aggressive." When the girls told him to leave them alone, he got close to them and said, "I'm going to fuck you so hard later." Piland continued to make similar aggressive sexual comments throughout the entire night. Sullivan testified that the morning after the party, she observed C.D. "sobbing" and that "she looked really distraught."

Wacker testified that he and C.D. dated for three-and-a-half years during high school, but that they were no longer together romantically. On the night of the offense, Wacker watched C.D. go into the basement bedroom alone, and he soon noticed that she "appeared to be passed out on the bed." About an hour later, Wacker saw Piland go into the bedroom and shut the door. Wacker went into the room and told Piland that he could not sleep there; C.D. had to sleep alone. Wacker helped Piland up from the bed and escorted him out of the room. Wacker then reclined

- 4 -

in a chair just outside the bedroom so he could keep watch on the door. About thirty minutes later, Piland again entered the room where C.D. was sleeping, and he laid next to her on the bed. Wacker again entered the room and told Piland to leave. After Piland entered the room a third and fourth time, Wacker locked the bedroom door from the inside and closed the door. He then went back to the recliner and fell asleep. When he awoke at around 7:00 a.m., C.D. was exiting the bedroom "with just her shirt covering her butt, no pants." She appeared confused, or sad, as she made her way to the bathroom. Shortly thereafter, C.D. told Wacker that Piland assaulted her.[3]

Forensic Nurse Examiner Andrea Haick examined C.D. at the hospital and used a PERK[4] to collect evidence. Haick testified that C.D. was calm and cooperative but had a "very somber, very flat affect." During the exam, C.D. reported to Haick that "she was at a party, that she had been drinking, that [Piland] had attempted to anally penetrate her, that her ex-boyfriend had tried to close the door to keep Piland away from her," and that "she tried to get away from him and went to her ex-boyfriend at one point." Haick did not observe any physical injuries on C.D.'s body and noted no injuries to C.D.'s rectal area, but according to Haick, that is not uncommon. Haick then collected possible DNA samples by swabbing C.D.'s neck, breasts, thigh and external genitalia, her anal and perianal areas, and her lips and mouth. The PERK was submitted to the police.

Loudoun County Sheriff's Detective Lindsay Sayre investigated the case. She obtained a search warrant for the crime scene and for Piland's DNA. She later collected DNA from Christopher Scarce, C.D's boyfriend at the time of the offense. Investigator Sayre then collected

---

[3] Multiple other people present at the house the next morning testified that they overheard C.D. make similar statements about the incident. Darby Adams also testified that he saw Wacker make Piland leave the bedroom where C.D. was sleeping.

[4] A PERK is a Physical Evidence Recovery Kit.

the PERK evidence from the hospital and ultimately submitted the DNA samples and the PERK evidence to the Department of Forensic Science for analysis.

At trial, during cross-examination, Detective Sayre said "no" when defense counsel asked Detective Sayre if she had ever asked Piland "his side of the story." Counsel then asked if she had ever asked him if he wanted to talk to her, and she responded, "[h]e was already arrested when I had the opportunity to talk to him." Defense counsel pressed, "[y]ou would agree with me that just because an individual is arrested, it doesn't stop you from asking him whether or not he wants to talk to you?" to which Detective Sayre replied, "[i]t was also questionable because at the search warrant, there were attorneys on the phone in support." Counsel asked, "[s]o you made an assumption that he was represented by counsel, but did you ever ask him?" Again, Detective Sayre said "[n]o."

During re-direct examination, the prosecutor asked Detective Sayre, "[b]ased on your training and experience as a law enforcement officer, are you allowed to speak to individuals who are represented by attorneys?" Detective Sayre replied "[n]o." The prosecutor also asked Detective Sayre why she believed there were attorneys involved when she was at the Reinertson home, and Detective Sayre explained that "[i]t was mentioned that Mr. Piland's grandmother was an attorney" and that, during her time at the home, Piland's grandmother "had another attorney on speakerphone." The prosecutor asked Detective Sayre, "[b]ased on what you understood at that point, did you feel comfortable, after making an arrest, after seeing these attorneys involved, speaking to Mr. Piland?" Detective Sayre said, "No."

Forensic biologists Kari Dodd and Kelly Loynes were both qualified to testify as expert witnesses at trial. Dodd testified that Piland could not be excluded as a major contributor to a mixture of DNA recovered from C.D.'s neck swab. Loynes testified that Piland could not be excluded as a major contributor to two mixtures of male "non-sperm" DNA located in the

- 6 -

"interior crotch" and "interior rear" of C.D.'s underwear. The Commonwealth admitted certificates of analysis memorializing these findings at trial.

During cross-examination, Dodd explained that if a piece of clothing was porous, DNA contained in a liquid "would be more likely to go through, versus just skin cell[s], which would be more likely to stay on whatever side it's [deposited] in." Dodd also explained that with DNA generally, "[t]here is a degree of transfer that can occur" and that there are "many factors" that contribute to how much DNA would be deposited, including "the length of contact, the amount of pressure given, repeated contact." Defense counsel asked Dodd, if one had been wrapped in a blanket all night, and other people had slept on that blanket, whether it was likely that the person would have DNA from other people on her skin. Dodd said there "could be some contact . . . that occurs" and explained that "[s]kin cells would contribute less than if there was like a wet body fluid that would contribute more."

After the Commonwealth rested, Piland moved to strike the charges. As to the aggravated sexual battery charge, Piland argued that the evidence was insufficient to demonstrate C.D. was physically helpless and noted inconsistencies in C.D.'s testimony. The trial court denied the motion.

Before Piland presented his case, the prosecutor objected to testimony from his expert witness, J. Thomas McClintock, because the defense had not provided "any summary of Mr. McClintock's testimony or any reports that he prepared," in violation of the discovery order, which required the disclosure of such information within 60 days of trial. The prosecutor said that Piland's notice of intent to offer expert testimony "tells us nothing about what [McClintock's] testimony is going to be. The discovery order requires us to have a summary of his testimony or a report that he prepared. We don't have any of that." The Commonwealth therefore asked the trial court to exclude McClintock's testimony. Defense counsel said that she

filed the expert designation on August 4, 2022, which stated that McClintock "may testify as an expert regarding DNA [and] the DNA findings" in the certificates of analysis, which were attached to the designation. Defense counsel argued that because Rule 3A:11 provided that attaching a copy of a certificate of analysis from the Department of Forensic Science ["DFS"] satisfied the Rule, her expert designation complied.[5]

The trial court found that attaching a copy of a DFS certificate satisfies the written report or summary disclosure requirement only when the witness was a DFS employee, not an outside expert, and it granted the Commonwealth's motion to exclude the testimony. Defense counsel asked the trial court to craft a different remedy and expressed concerns that excluding the testimony was unfair and detrimental to Piland and "puts the Defendant in the spot of a due process violation." The trial court denied the request.

The trial court allowed defense counsel to proffer what McClintock's testimony would have been, and she proffered the following:

> Dr. McClintock would have testified in trial as an expert in forensic DNA analysis. He would have testified that the October 13th, 2020 certificate of analysis, his interpretation is as follows: Mr. Piland was not detected in the lip sample, the thigh/external genitalia area sample; vaginal/cervical sample, breast sample, perianal sample, or the anorectal sample. He would have testified

---

[5] Rule 3A:11 requires the defendant to notify the Commonwealth "in writing" if he intends to introduce expert opinion testimony and to provide

> (i) any written report of the expert witness setting forth the witness's opinions and the bases and reasons for those opinions, or, if there is no such report, a written summary of the expected expert testimony setting forth the witness's opinions and the bases and reasons for those opinions, and (ii) the witness's qualifications and contact information.

Rule 3A:11(d)(4)(A). It also states that, "[p]roviding a copy of a certificate of analysis from the Virginia Department of Forensic Science or any other agency listed in Virginia Code § 19.2-187, signed by hand or by electronic means by the person performing the analysis or examination, *satisfies the requirements of subparts (d)(4)(A)(i) and (ii) of this Rule*." Rule 3A:11(d)(4)(B) (emphasis added).

that there were at least three people contributing to the mixture profile on the Complainant's neck. He would have testified that there is no indication that any DNA in the profile mixture from the neck was sexual DNA. There is no indication of any sexual DNA from Mr. Piland on any sample.

In the March 8th, 2021 certificate of analysis, Mr. Piland was not found on the cervical sample, thighs external sample, external genitalia sample, perianal sample, buttocks sample. There were mixtures of more than one male in both the rear and crotch of the underwear in 3LSS3 and 3LSS4, and a person's DNA can transfer from the clothes to the bed. Their clothes can transfer to each other. And that the act of anal sex and/or rape would result in a transfer of DNA from one person to another on the anus, buttocks and perineum.

Piland presented testimony by a private investigator, who testified that she tested the lock on the bedroom door, which was working, and she was unable to open it despite her attempts. She also did not see any scratches, scrapes, or kick marks on the door. Piland also presented testimony from Hunter Fulton, who was present at the party, and testified that he saw C.D. flirting with and constantly talking to Piland throughout the night. Fulton admitted that he never saw C.D. hold Piland's hand or kiss Piland.

The defense recalled Dodd, who testified about the concept of DNA transfer. Dodd explained that when two items, or two people, mingle with one other, "they can impart DNA from one item to the other." Dodd said that two people could leave DNA on each other, a person could leave DNA on an object, and if there was DNA already on an object, it could transfer to another object or to a person. DNA moving from a person to an object is direct transfer, and DNA left on an object by a person touching it that moves to another object is secondary transfer. Factors that can contribute to the likelihood of transfer include pressure, the duration of contact, the condition of the DNA, and the type of DNA. Dodd testified that when talking about DNA transfer through an item, if the material was thick like leather or denim, it would be less likely for DNA to transfer from one side of the material "all the way out, or all the way in" and if the

- 9 -

material was "thinner or more porous . . . then you would be more likely to have transfer."  Dodd continued, "[s]o transfer doesn't just naturally . . . occur.  There has to be some sort of contact that happens.  But it is more likely to move through a more porous, thinner material than a more thick, solid material."

After Dodd testified, the defense rested and renewed the motion to strike on the same grounds, which the trial court denied.

During closing argument, while addressing Detective Sayre's testimony and defense counsel's cross-examination of her, the prosecutor stated:

> The other question that she was asked, and the way that it was asked was more of an implication of why didn't you let [Piland] tell his side of the story?  Why didn't you let him say what happened?  And Sayre told me why she didn't.  Because lawyers were already involved in this case[,] and she told you as a law enforcement officer they are not allowed to speak to suspects who are represented by attorneys.  That makes sense.  If someone is represented by an attorney, you don't want law enforcement going behind that attorney's back and asking them questions.  That's a rule; Detective Sayre followed it.  There's nothing untoward about her behavior in not talking to Ricky Piland.  Ricky Piland has an absolute right to remain silent.  He did back then[,] and he does today.  And the fact that she didn't interview him was respecting not only his right to remain silent but his right to counsel.

Defense counsel requested a sidebar, saying, "[t]here was a comment just made by the Commonwealth that I think needs to be addressed."  Defense counsel said, "Piland never invoked his right to remain silent when the investigation began.  He was never asked whether or not he wanted to make a statement."  The trial court asked, "[w]hat's the objection?" to which defense counsel replied, "I think I'm going to make a motion for potential mistrial."  When asked the grounds for the objection, defense counsel said, "[t]hat the Commonwealth is making reference to him invoking his right to remain silent at that time, which he didn't because he was never ever questioned by the detective."

- 10 -

The trial court overruled the objection and denied the motion for mistrial, stating that Piland opened the door to the evidence by asking Detective Sayre why she had not interviewed Piland and that the prosecutor's argument was fair based on that evidence, to which the defense had not objected.

The jury convicted Piland of aggravated sexual battery. Before sentencing, defense counsel filed a motion to reconsider the motion for mistrial and a motion to set aside the jury verdict. The trial court held a hearing, during which defense counsel argued that: (1) the jury verdict should be set aside because of the trial court's refusal to allow his expert witness to testify at trial; (2) the jury was permitted to consider DNA evidence for which the chain of custody was not properly established; (3) the trial court had no basis to reconsider the Commonwealth's request to present prior bad acts evidence; and (4) Piland had "a sufficiency of evidence argument, kind of an impossibility argument." Defense counsel further argued that the trial court should reconsider its denial of Piland's motion for a mistrial because the Commonwealth's statement during closing argument violated the rule "that any comment made by a prosecutor referring [to] a defendant's right not to testify is a violation of defendant's privilege against self-incrimination guaranteed by the Fifth Amendment of the U.S. Constitution." The trial court denied both motions. Piland timely noted this appeal.

## II. ANALYSIS

### A. *Sufficiency of the Evidence*

Piland argues that the evidence was insufficient to prove an act of "sexual abuse." We disagree and find the evidence sufficient to sustain the conviction.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting

- 11 -

*Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)).

"An accused is guilty of aggravated sexual battery if he or she sexually abuses the complaining witness, and . . . [t]he act is accomplished through the use of the complaining witness's mental incapacity or physical helplessness . . . ." Code § 18.2-67.3(A)(2). "'Sexual abuse' means an act committed with the intent to sexually molest, arouse, or gratify any person, where . . . [t]he accused intentionally touches the complaining witness's intimate parts or material directly covering such intimate parts." Code § 18.2-67.10(6)(a). "Intimate parts" are "the genitalia, anus, groin, breast, or buttocks . . . ." Code § 18.2-67.10(2).

Here, C.D. testified that on the night of the offense, after many hours of partying, she entered a bedroom and laid on top of the covers on the bed. She fell asleep on her stomach fully clothed. When she went to sleep, the door was open and the room was illuminated. She awoke to "excruciating" pain in her rectum. She saw that the bedroom door was now closed and Piland was lying behind her. She was now wearing only her underwear and a t-shirt.

The following morning, Piland apologized for what he did in both a text message and a phone call. He did not deny his actions, and he also spontaneously admitted to a previous similar incident of abuse. A reasonable factfinder could infer from C.D.'s testimony, and from Piland's apologies, that Piland entered the bedroom while she slept, closed the door, turned her onto her side, removed her shorts, and touched her rectum, causing her pain. "[T]he testimony of a single witness,

if found credible by the trial court and not found inherently incredible by this Court, is sufficient to support a conviction." *McCary v. Commonwealth*, 36 Va. App. 27, 41 (2001).

Piland argues that C.D.'s testimony was "both internally inconsistent and contradictory" to the testimony of other witnesses called by the Commonwealth.[6] But determining the credibility of the witnesses and the weight afforded their testimony "is within the exclusive province of the jury, which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). This Court must accept the jury's resolution on the credibility of a witness's testimony "unless, 'as a matter of law, the testimony is inherently incredible.'" *Lambert v. Commonwealth*, 70 Va. App. 740, 759 (2019) (quoting *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006)). We will not find "a witness'[s] testimony is inherently incredible unless it is 'so contrary to human experience as to render it unworthy of belief.'" *Id.* (quoting *Johnson v. Commonwealth*, 58 Va. App. 303, 315 (2011)).

There was nothing inherently incredible or contrary to human experience about C.D.'s testimony. The record supports the jury's factual findings and the inferences drawn therefrom. The inconsistencies in C.D.'s testimony do not compel a different result since they were presented to the jury and argued at trial. Moreover, the Commonwealth questioned C.D. about each inconsistency, and C.D. had a chance to explain. Ultimately, the jury resolved the inconsistencies in C.D.'s testimony in favor of the Commonwealth, and we, as an appellate court, are bound by the jury's findings because they are supported by the record and not plainly wrong.

---

[6] On appeal, Piland also argues (1) that it was impossible for him to commit the crime because the bedroom door was locked, and (2) that the DNA evidence recovered from C.D.'s neck and underwear might have resulted from indirect contact. We do not consider these arguments because Piland did not make them below. *See* Rule 5A:18 ("No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice.").

Finally, although not required, the record contains extensive evidence corroborating C.D.'s account. Wacker testified that he had to remove Piland from the basement bedroom three or four times before finally locking the door and settling into a chair just outside the room to keep watch over C.D. Nolan and Sullivan both testified to Piland's sexual aggression on the night of the offense—Nolan even testified that Piland also tried to get into her bed with *her* before being told to leave the room she was sleeping in. Nolan also heard Piland on the morning after the party apologizing to someone over the phone about what he did to C.D. C.D. disclosed the assault to Wacker as soon as he woke up and then went home and immediately told her mother. *See* Va. R. Evid. 2:803(23) ("In any prosecution for criminal sexual assault . . . the fact that the person injured made complaint of the offense recently after commission of the offense is admissible, not as independent evidence of the offense, but for the purpose of *corroborating the testimony of the complaining witness.*" (emphasis added)). Other witnesses observed C.D. crying and distraught on the morning after the offense, and C.D. went to the hospital that same day and endured the indignity of a PERK. Furthermore, Piland's DNA was located on C.D.'s neck and inside her underwear. C.D.'s testimony, corroborated by the other witnesses and the physical evidence, sufficiently established that Piland sexually abused C.D. "through the use of [her] mental incapacity or physical helplessness," as prohibited by Code § 18.2-67.3(A)(2). We will leave the jury's guilty verdict undisturbed.

B. *Prior Bad Acts*

Piland next argues that the trial court erred by admitting prior evidence of prior bad acts. He contends that the evidence was "not relevant to prove modus operandi or relationship between the parties, was too remote to be relevant, and was unfairly prejudicial to the appellant."

"The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." *Abdo v. Commonwealth*,

64 Va. App. 468, 473 (2015) (quoting *Blain v. Commonwealth*, 7 Va. App. 10, 16 (1988)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Tynes v. Commonwealth*, 49 Va. App. 17, 21 (2006) (quoting *Thomas v. Commonwealth*, 44 Va. App. 741, 753, *adopted upon reh'g en banc*, 45 Va. App. 811 (2005)).

Generally, evidence of an accused's other criminal acts is "inadmissible to prove guilt of the crime for which the accused is on trial." *Gonzales v. Commonwealth*, 45 Va. App. 375, 380 (2005) (en banc). "The policy underlying the exclusion of such evidence protects the accused against unfair prejudice resulting from the consideration of prior criminal conduct in determining guilt." *Sutphin v. Commonwealth*, 1 Va. App. 241, 245 (1985). Even so, "'prior bad acts' evidence is admissible 'if it tends to prove any relevant fact pertaining to the offense charged, such as where it is relevant to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, accident, or if they are part of a common scheme or plan.'" *Conley v. Commonwealth*, 74 Va. App. 658, 670 (2022) (quoting Va. R. Evid. 2:404(b)). Other crimes evidence is also admissible when it "*shows the conduct or attitude of the accused toward his victim*[,] establishes the relationship between the parties[,] or negates the possibility of accident or mistake." *Kenner v. Commonwealth*, 71 Va. App. 279, 291 (2019) (alterations in original) (quoting *Ortiz v. Commonwealth*, 276 Va. 705, 714 (2008)). Finally, evidence of prior bad acts "is allowed if relevant to show the perpetrator's identity when some aspects of the prior crime are so distinctive or idiosyncratic that the fact finder reasonably could infer that the same person committed both crimes." *Guill v. Commonwealth*, 255 Va. 134, 138-39 (1998).

In this case, the trial court did not abuse its discretion by allowing C.D. to testify that on a prior occasion in 2017, she was sleeping at a friend's house when she awoke to find Piland in bed, right behind her, with his fingers in her vagina. Although she did not confront him that time, she moved her body to ward off the assault and pretended to be asleep. Contrary to Piland's assertion,

- 15 -

the facts from the 2017 incident are nearly identical to the facts presented here. On both occasions, Piland got into bed with C.D. as she slept, turned her onto her side, and sexually assaulted her while she was unconscious and unaware of his presence. Piland not only admitted to the prior bad act during the controlled call on the morning after the instant offense—he is also the one who raised the issue. A reasonable fact finder could infer from that fact that even Piland thought the two incidents were similar. Thus, the evidence was indicative of Piland's conduct and attitude toward C.D. and the nature of their relationship—his predatory behavior toward an unwilling, unwitting victim. Moreover, Piland's hypothesis of innocence at trial was that he was not the perpetrator of the July 24, 2020 sexual assault. In fact, he argued at trial that he was never in the room with C.D. Thus, the prior bad acts evidence was probative of Piland's identity as the perpetrator of the offense.

The mere fact that the previous incident occurred three years before the instant offense does not, as Piland contends, render it so remote in time as to make it inadmissible at trial. While it is true that prior crimes evidence *may* be too remote in time where it shows "no causal relationship or logical connection between" the first incident and the second, *Quinones v. Commonwealth*, 35 Va. App. 634, 642 (2001), once factual relevancy has been established, the trial court "should not withhold such evidence solely on the basis of remoteness unless the expanse of time has truly obliterated all probative value," which is a "determination . . . committed to the sound discretion of the trial court," *Lafon v. Commonwealth*, 17 Va. App. 411, 419 (1993). In this case, the evidence established a clear logical connection between the two offenses. Both instances involved Piland and C.D., and both incidents involved a scenario where Piland got into bed with C.D. while she slept and sexually assaulted her. In the first instance, C.D. awoke to find Piland's fingers in her vagina, and in the second she awoke to "excruciating" pain in her rectum. Piland did not deny his actions. He apologized for what he did in the second incident in both a phone call and a text. And he

spontaneously brought up the first incident when talking about the second incident. Three years is not so remote in time to obliterate the probative value of the prior bad act.

Finally, Piland argues that the evidence was more prejudicial than probative. "All evidence tending to prove guilt is prejudicial to an accused." *Powell v. Commonwealth*, 267 Va. 107, 141 (2004). Thus, "relevant evidence will only be excluded if its prejudicial nature *substantially* outweighs its probative value." *Conley*, 74 Va. App. at 673. "To be excluded as unfairly prejudicial, 'the nature of the evidence must be such that it generates such a strong *emotional* response that it is unlikely that the jury could make a *rational* evaluation of its proper evidentiary weight.'" *Id.* (quoting *Fields v. Commonwealth*, 73 Va. App. 652, 673 (2021)). In this case, the evidence of Piland's 2017 assault on C.D. came solely from C.D.'s very brief testimony at trial. The record contains no photographs, videos, medical records, or other exhibits by which we can conclude the jury was so inflamed that it failed to make an unemotional, rational evaluation of the prior crimes evidence. Therefore, the trial court did not abuse its discretion in determining that the evidence was not more prejudicial than probative. Accordingly, the trial court did not err in admitting evidence of Piland's prior assaultive behavior against C.D.

C. *Exclusion of Defense Expert Witness Testimony*

Piland next argues that, for two reasons, the trial court erred by excluding McClintock's expert witness testimony at trial: first, because the trial court misinterpreted and misapplied Rule 3A:11 and the discovery order entered on April 13, 2021, and second, because the trial court's ruling violated his constitutional and due process rights to present evidence in his defense. To resolve this case on the best and narrowest ground, we assume without deciding that the trial court erred by excluding McClintock's testimony at trial but conclude that any error was harmless. *See Commonwealth v. White*, 293 Va. 411, 419 (2017).

"Constitutional error is harmless if the appellate court is 'able to declare a belief that it was harmless beyond a reasonable doubt.'" *Harvey v. Commonwealth*, 76 Va. App. 436, 483 (2023) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). "Harmless error analysis 'is available not only when the error consists of erroneously admitting evidence' for the Commonwealth 'but also when it consists of [erroneously] excluding defense evidence.'" *Id.* (alteration in original) (quoting *United States v. Cerro*, 775 F.2d 908, 916 (7th Cir. 1985)). "The test for the two types of error is not 'identical,' in part because 'an asymmetry' exists between allowing the prosecutor 'to put in more evidence of guilt than he should have' and the extreme case of preventing the defendant 'from putting on a[ny] defense [at all].'" *Id.* (alterations in original) (quoting *Cerro*, 775 F.2d at 916). However, when a defendant is only partially deprived of the "right to call witnesses on his behalf," the error is harmless if the record establishes beyond a reasonable doubt "that a rational jury would have found the defendant guilty absent the error." *Id.* at 483-84 (quoting *United States v. Rhynes*, 218 F.3d 310, 323 (4th Cir. 2000) (en banc)). Thus, in conducting a harmless error analysis, the reviewing court must consider "the potential effect of the excluded evidence in light of all the evidence that was presented to the jury." *Haas v. Commonwealth*, 299 Va. 465, 467 (2021) (quoting *Commonwealth v. Proffitt*, 292 Va. 626, 642 (2016)). "Ultimately, constitutional error in excluding defense evidence is harmless if 'the evidence of guilt was overwhelming and the defendant was allowed to put on a defense, [even] if not quite so complete a defense as he might reasonably have desired.'" *Harvey*, 76 Va. App. at 484 (alteration in original) (quoting *Cerro*, 775 F.2d at 916).

In this case, the proffer of McClintock's testimony included the same information already testified to by forensic biologists Dodd and Loynes. Indeed, Dodd and Loynes testified that Piland's DNA was recovered from a mixture of DNA found on C.D.'s neck sample and from two separate mixtures inside her underwear. Consistent with the testimony of Dodd and Loynes,

McClintock would have testified that Piland's DNA was not detected in samples taken from C.D.'s lip, her thigh/external genitalia area, her buttocks, or her vaginal/cervical, anorectal or cervical, and perianal areas. McClintock would have testified, as did Dodd and Loynes, that there were at least three people contributing to the mixture profile on C.D.'s neck and that nothing suggested that any of the DNA in the profile mixture from her neck and underwear was sexual. Dodd testified on cross-examination *and* in Piland's case-in-chief that DNA can be transferred directly and indirectly through clothing and material from person to person, person to objects, and objects to objects. Thus, the Commonwealth's experts had already testified to the assertions contained within the proffer of McClintock's testimony. Any error in refusing to allow McClintock to testify about the DNA evidence was therefore harmless. The jury heard the evidence McClintock would have testified to and still convicted Piland.

D. *Prosecutor's Closing Arguments*

Lastly, Piland asserts that the trial court erred in denying his request for a mistrial after "the Commonwealth impermissibly commented on [his] constitutional right to remain silent and right to counsel, which implicitly drew attention to his decision to not testify." We find no merit in this final assertion.

"We review a challenge to a circuit court's denial of a mistrial motion under established principles. The decision whether to grant a mistrial motion is a matter submitted to the circuit court's sound discretion." *Lewis v. Commonwealth*, 269 Va. 209, 213 (2005). "An abuse of discretion occurs only when 'reasonable jurists' could not disagree as to the proper decision." *Thomas v. Commonwealth*, 62 Va. App. 104, 111 (2013) (quoting *Brandau v. Brandau*, 52 Va. App. 632, 641 (2008)). "In a criminal case, when defense counsel makes a motion for a mistrial based on an allegedly prejudicial remark or question by the prosecutor, the circuit court must make a factual determination whether a defendant's right to a fair trial has been prejudiced, thereby

requiring a new trial." *Lewis*, 269 Va. at 214. "[W]e will not reverse the denial of a motion for a mistrial unless a manifest probability exists that the trial court's ruling was prejudicial." *Wright v. Commonwealth*, 52 Va. App. 690, 707 (2008) (quoting *Perez v. Commonwealth*, 40 Va. App. 648, 654 (2003)).

"It is firmly established that any comment made by a prosecutor referring to the defendant's right not to testify is a violation of the defendant's privilege against self-incrimination guaranteed by the Fifth Amendment of the United States Constitution." *Hazel v. Commonwealth*, 31 Va. App. 403, 411 (2000). "The accused's right to remain silent at trial prohibits 'the prosecutor's use of any language or device which compels a defendant to testify.'" *Id.* (quoting *Waldrop v. Commonwealth*, 23 Va. App. 614, 622 (1996), *rev'd on other grounds*, 255 Va. 210 (1998)).

> The test for determining whether a comment relating to an accused's Fifth Amendment right to remain silent is constitutionally forbidden is whether, under the circumstances of the case, "'the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the [right] of the accused to testify.'"

*Id.* (alteration in original) (quoting *Hines v. Commonwealth*, 217 Va. 905, 907 (1977)). "Although a prosecutor's comment on the accused's right to remain silent may be improper, such a statement does not constitute prejudice *per se*." *Id.* at 411-12. Rather, the prohibition is intended to guard against "the *exploitation* of that constitutional right by the prosecutor." *Pulley v. Commonwealth*, 31 Va. App. 600, 604 (2000) (emphasis added) (quoting *Lindgren v. Lane*, 925 F.2d 198, 202 (7th Cir. 1991)). The inquiry "'centers . . . around the particular use to which the post-arrest silence is being put[]' and, therefore, requires consideration of the particular circumstances of each case." *Id.* at 605 (alterations in original) (quoting *Lane*, 925 F.2d at 202).

Here, the prosecutor's statement in closing argument was not a comment on Piland's constitutional right not to testify. Nor was it intended to compel his testimony or exploit his right to remain silent. Rather, the prosecutor's statement was a response to Piland's suggestion that

Detective Sayre neglected to conduct a thorough investigation by failing to ask him his side of the story. The prosecutor's statement in its entirety was merely a comment on Detective Sayre's understanding—a correct one—that she could not speak to a defendant who is represented by counsel. Indeed, when Detective Sayre arrived at Reinertson's to serve the search warrant, Piland's grandmother, an attorney, was present at the house and another attorney was on speakerphone. Under those circumstances, Detective Sayre's hesitation in speaking to Piland was reasonable. The prosecutor's comment was solely an explanation for Detective Sayre's hesitation.

We therefore find that the prosecutor's statement was not improper. Because the prosecutor did not impermissibly comment on Piland's Fifth Amendment rights, we need not decide whether the statement was prejudicial to Piland's case. The trial court did not abuse its discretion by refusing to grant Piland's motion for a mistrial.

### III. CONCLUSION

For these reasons, the trial court's judgment is affirmed.

*Affirmed.*